May it please the court, I'm still here. Good morning again. And I'm representing Petitioner Roger Smith, who for 15 years has consistently maintained that he did not kill Emmett Kozelman and he was being punished for the actions of Jacob Edmonds. He's right. This morning, I reread Judge Trott's opinion in Bernal-Obeso about warning of the grave peril of informing co-defendant testimony. And I think this is a case that really illustrates how gravely things can go wrong. This is a case where the state sensibly cut a deal with the devil, with the killer, Jacob Edmonds. And then at best, it continued to be complicitous in hiding the truth for a decade and a half. A condition precedent to Edmonds' plea deal was that he pass a polygraph test indicating, answering that he did not strike or personally participate in the killing of Emmett Kozelman. That agreement is in the excerpt of Record 187. The polygraph report is at 278 and 279. The polygraph report says the answers were inconclusive, but the examiner thought he was being truthful. Yes, the Albany police officer who administered the test said he appeared to answer in a truthful manner, but the objective data from the polygraph examination itself was inconclusive, both as the deception and truth. Is it usual for a polygraph administrator to offer a personal opinion? Is it appropriate for them to do so? In my experience, it's not either of those things, but in any event, it does not change the objective data. Now, I'm curious as to why he would even write anything down here. I mean, if you're walking out of the room, he says, well, I don't know, it didn't come out right. But based on my experience, it kind of looks like he was telling the truth. But it's another thing to write it down in the report. I'm wondering whether that's regular for a polygraph administrator to do so. I think that's irregular, as was it irregular for him to provide Mr. Edmonds and Edmonds' counsel the relevant questions in advance of the polygraph examination, yet that's what the report shows was done as well. I think the reason that we see that here is because there is this horrific murder, and it needs to be solved. And it turns out that they strike this deal with Jacob Edmonds, who the physical evidence and even the surviving victim's testimony points to as the actual murderer. Was there an agreement with Smith's counsel to get access to the polygraph results? There was no agreement with Smith's counsel as to that. You're just strictly asking for this as grainy material. Well, they asked for it. I mean, it's clear that within a week of the polygraph examination being given, the prosecutor communicated to defense counsel, he passed, we're going forward with Edmonds' deal, Edmonds is going to testify against your guy. But you didn't have an arrangement with the prosecutor to obtain the results of Edmonds' polygraph. There was no agreement there. There was no agreement. There was a specific request made for that, and that was made in June of 1987. It was, however, never produced for more than 13 years. And the implication of what you can tell was communicated to defense counsel was that Edmonds had passed the polygraph. Well, you said a minute ago the prosecutor said he passed, he's going to testify against your guy. Now you're saying, well, that's an implication. Well, let me read you the letter from defense counsel to the prosecutor on the 23rd of June, 1989. It is our understanding that Jacob Edmonds has taken a polygraph and based upon the interpretation of Darr Holmes has successfully passed the polygraph. I would like to have a list of the questions that was asked Mr. Edmonds by Mr. Holmes, as well as a copy of the polygraph tape for purposes of independent review. So the defense counsel says it's his understanding that he passed. Do we know what that's based on? We know that the test was administered six days earlier. We know that the plea agreement requires Edmonds to truthfully confess his involvement and go forward against Mr. Smith. Certainly the prosecutor did nothing to disabuse him of the notion that he had passed. Certainly not. And when we get involved in the case and after he does nothing then, he does nothing in 1996 when Edmonds recants. He does nothing when we get involved in the case in 2001 obtaining an affidavit from Edmonds where we specifically ask, did you take a polygraph? And Edmonds says, I did. And I was told I neither passed nor failed. At that point we amended our petition in the federal habeas case in November of 2001 to include a due process Brady claim. Still the information isn't disclosed for another 16 months until February of 2003. The implication up until that time always continues to be that Edmonds did pass the test and that adds a great deal of weight to what happens and it leads to Mr. Smith pleading no contest, although he's constantly asserting I did not kill this man. I'm being held responsible for what Edmonds did. Why were you entitled under Brady to receive the polygraph report? Because the polygraph report imputes the co-defendant who's testifying against him's account that Mr. Smith is the actual killer. That co-defendant's account is the only real evidence that he's the actual killer. The physical evidence, the blood evidence, the surviving victim's account, both show that the killer is Edmonds. That is the piece that makes defense counsel, who does a very poor job in evaluating the evidence, say, you know, we got him to take this deal to escape the death penalty. Only the killer was potentially going to get the death penalty. Edmonds was the killer. And so it becomes highly relevant. I have no doubt it's relevant. I'm just wondering if under Brady, pretrial, you're entitled to that report. I think that under Brady and under due process you are, and certainly where the prosecution tacitly misrepresents the outcome of it and is aware that it is an operative fact in obtaining the plea, you are entitled to it. I'll make one more point before I move on from that. Immediately after, and the prosecutor wrote back, actually, on June 30th of 89. This was at 897 of the record. It says, regarding your request for the polygraph information, the State can't even mention the polygraph, let alone use the results. I can't see why you're entitled to it. But if you believe it will persuade your client to admit his involvement, I'll try to find some justification for honoring your request. But he never does. Nothing is further pursued. And let me ask you something about the procedure, the posture of this case at this moment. The district court ruled that it was procedurally borne, right? Yes. And what we're doing here is deciding whether to reverse that ruling. We're not going to decide the merits of the underlying claims. Is that right? Well, the Brady claim itself I don't believe is procedurally barred. The district court really did not address that claim. But as to the ineffective assistance of counsel claim that's underlying, that was found to be procedurally barred. And in response to that, yes, there are two reasons why that bar should be excused. Okay. Now, are those the only two substantive claims, the Brady claim and the ineffective assistance claim? Yes. There's a separate kind of Westerl issue and some discovery issues. Well, that really goes, that issue goes. Those are not substantive. It doesn't go, it goes to what should go on in the proceedings below, not to the underlying conviction. That's correct. Okay. So if this were remanded, it would be the district court would then examine the merits of the ineffective assistance claim and the merits of the Brady claim? Yes. But the Brady claim is a little different in that that's if we remanded on the basis of the actual innocence. Or on a, I think. Or on the Brady claim? Well, I think on the Brady claim, I think this Court can reach that because I don't think there is a default because the State, until late in the course of this litigation, kept that information hidden. Well, that's the question. Are we at a stage where we should then say, all right, that couldn't be procedurally barred. Therefore, we should remand that since the district court hasn't yet considered it on the merits. I think you could remand it for the district court to consider in the first instance, yes. That would be under the cause and prejudice analysis? No. On the Brady claim, I don't believe there is any default issue because of the State's actions in keeping the information hidden for so long. Well, I thought that's the cause. Well, I mean, you could, I suppose, characterize it as cause and prejudice. The State has never asserted a procedural default defense or even really joined that issue, even though we incorporated it in the pleading shortly after obtaining Edmund's affidavit. Does the State not contend that it's procedurally barred? I don't believe so. I don't believe they've ever really addressed the issue. If I can address the second reason for excusing you. I'd like you to get to the procedural bar, to the question as to whether this is procedurally barred. So I'd like you to get to the question of actual innocence before you sit down. Okay. And I was, there's a second issue why it's not barred I'd like to try to get to, but let me address actual innocence first. Okay. And the record is obviously factually very complicated, but I tried to distill this into a very small bit of the record. Let me, maybe I can, maybe I can, I can sort of jumpstart our discussion. I want to make sure I'm right on this. So I'm not, I'm not asserting these things as true. I'm sort of, asserting them rhetorically and asking you to correct me if I'm wrong. As I understand it, Mr. Smith is convicted under, under 163.115. That is not the aggravated murder statute in Oregon. That's correct. The felony murder statute in Oregon. Mr. Smith is not convicted of wielding a crowbar. Am I correct on that? In other words, the fact as to whether or not he was, he was the one wielding the crowbar is not an element of the crime of which he is convicted. That is correct. If he had been convicted of aggravated murder, it undoubtedly would have been an element of, a necessary element of that crime. That's also correct. Okay. So whether he's wielded the crowbar or whether Edmunds wields the crowbar is not resolved by his plea of guilty to 163.115. Is that correct? I suppose that is correct, yes. Okay. So in order to show actual innocence here, you're going to have to meet what seems to me to be a very, very high standard, which is to show that when Smith and Edmunds go into this home, that Smith doesn't know. Let's assume that Edmunds has got the crowbar. I'm willing to assume that for this argument, that Edmunds is, Edmunds is quite correct that Smith did not wield the crowbar. You're going to have to show that Smith had no reason to know that Edmunds had a crowbar, even though they're going in to burglarize a home at night, carrying rope that they knew that they might have to tie up the occupants of the home with. You're correct that he has to satisfy the elements of the affirmative defense, actually, to felony murder, which involve not knowing that a co-defendant is armed and not knowing that it's likely that they're going to kill someone. It looks like you get, to me, like you get through the first three of those, of those five elements of the affirmative defense to felony murder. Those last two have some explaining to do, I think. Well, in my reply, I believe I laid out that it really is only as to those last two that there's, I think, room for disagreement. And I attempted to do that. But let me make the core points here. First of all, the men, the evidence was not that they entered the house together. They entered the garage together. The evidence is that Mr. Smith entered first. The evidence from both Edmunds and the third man, who ends up abandoning before the residential burglary takes place, is that it's Edmunds who searches the tool room in the garage from which the crowbar is taken. The crowbar was not brought to the scene by the man. Thereafter, they're in the house. The house is dark. It's clear from this right here. So Smith enters first and Edmunds enters later with a crowbar, is it? Yes. We're assuming it's Edmunds with a crowbar for the moment. Yes. So Smith goes in first, and then sometime afterwards, Edmunds comes in with a crowbar. And the men are presumably sort of ransacking the house. It is ransacked. Who's got the rope? It's not clear. There is not any clear evidence, I think, of who does that. Judge Panner in the district court noted that in addition to the disguises and other things that showed they didn't intend this from the outset, that the rope also suggested that there was no sort of intent to do this type of thing because you wouldn't tie someone up if you were going to kill them. You wouldn't need to do that. You could strangle somebody with the rope. I mean, there's a lot of other things you can do with rope besides tie people up. You could. The only testimony from anyone, and I believe it's from Edmunds who is deeply suspect, I think, in all of his testimony is that the rope was to tie someone up. And so that is why that's the only evidence in the record we have of that. Also, then, we know from the surviving victim. If you're going to, just as, you know, there's no reason to believe that 18-year-olds are logical when they do these kinds of things, but if you're going in and anticipating that you might have to tie somebody up, you might want to have some means of sort of enforcing your ability to get their hands behind them and tie them up. Some kind of external coercion seems like it would be very useful in a situation like that, again, to enforce your ability to get somebody's arms behind them and tie them with rope. Well, and again, I believe that the only discussion of having to tie someone up was from Edmunds, who also had the crowbar. But there is no suggestion that there was a discussion of a plan to coerce someone to do something or anything like that. Well, we have names for each other. We're going to disguise our names. You've got the high and low. Very clear that they were intent to conceal their identity, and as Judge Panner, I think, correctly finds, that attests to their fact that they were not planning on killing occupants if they were found, that they believed witnesses would be left to identify them, so they wore bandanas, they used the codenames and such. I realize that if I could have a couple of more. I've asked you some questions. No, no. Take some time. This is the end of the calendar, so. I think that, as we've just been discussing, and I think you agreed, it's clear going into it that they're not planning on killing someone. Really, the issue is, does Mr. Smith see the crowbar, know that Evans has it, is he present when he gets it, does he see it in the darkened house during the course of what they're doing, prior to the assault and killing? Or does he know from discussion that he's armed, or it's reasonably likely that he is? It's clear that they didn't come armed, so he shouldn't have known beforehand, and it's clear from what we just discussed that they did not intend or plan in advance that they would kill people. They were preparing to conceal their identity from any surviving witnesses, as Judge Panner found. I think that, coupled with- Because you don't have to show that the state, in order to prevail on its felony murder, doesn't have to show that one of the participants intended to kill somebody going into it. No. All they have to show is the death results. And in order to maintain your affirmative defense, you're going to have to show that nobody had any reason to believe that anybody going into this crime was likely to engage in conduct that would result in death. Judge Budbeier, I would disagree with you, and I think you're actually mirroring the mistake that Judge Panner makes, where he goes into this very speculative findings about what could have- that death might result, that the residents may be armed and might shoot one of the intruders, that aid rushing to the scene might be in a fatal car wreck. That is not what Oregon law requires. Oregon law requires more than that. It's not that death simply results from the commission of a felony. If that were the case, there really would be no defense. Oregon law grants the defense where the co-defendant was unaware that the person was armed with a deadly weapon and did not-wasn't going to put on notice that it was likely that their actions would lead to the death of someone. I think that that's quite different, and I think that distinction is critical here. Now, what are you reading from in the statute? I cite the statute- I have the statute in front of me. And let me read you the last provision, because I think that's the one you're referring to. The affirmative defense, the defendant must show that he had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death. Yes. And, I mean- You don't have to have any kind of specific intent to harm somebody. All you have to do is intend to engage in conduct that is likely to result in death. Well, and, of course, here the conduct, I would submit to you, that is at issue is bashing the old man with a tie rack. Well, this is a robbery in which we've got guys going in in disguise that is conducted in the middle of the night where they anticipate that they're going to have a confrontation with the occupants of the house. Otherwise, as you pointed out, there would be no need for the bandanas over their faces and the disguised names. I think they anticipate that they might, yes. They consider that possibility. That seems like a pretty high-risk situation, doesn't it? I mean, it certainly is. I mean, I think that's why, for instance, residential burglaries are punished at a greater height, where in Oregon they have a sentencing guideline scheme where there's an enhancement if someone is home and not just if it's a residence. Certainly those increase the gravity, but I don't think that they necessitate the likelihood of a deadly result. Is there any evidence of how they happened to pick this particular residence? It seems they were just driving about very randomly, trying to find things they could steal, and the garage door was open there. Now, may I go back to the procedural question in a moment? So if I understand it, then the actual innocence would only get you a hearing on the merits on the ineffective assistance of counsel claim if we agreed with your other argument that the Brady claim should be addressed on the merits because of your argument that you didn't know about it, you couldn't bring it, it was the state's conduct that gave you, as Judge Huggs says, the cause and prejudice. So the Brady claim independently could be reviewed if we agreed with your argument on Brady, but it wouldn't help you with your ineffective assistance. The actual innocence would go to both. Yes, if there was a default problem with the Brady, it would. And the second way around a default problem in this case is that the post-conviction process in this case, the first post-conviction trial, was inadequate to preserve or protect or allow Mr. Smith to vindicate his rights. And that's a point that Judge Panner did not focus on what we were focusing on because our complaint was not that counsel was ineffective or counsel did absolutely nothing, as Judge Panner found, but rather that the post-conviction court, when Mr. Smith said, we can't go forward, my lawyer has done nothing, he's not putting on the evidence I want, he hasn't met with me, said, you're not getting a new lawyer, you're going forward today, and specifically inquired about what Mr. Smith wanted, and he said, I want the prosecutor to pose, I want my lawyer to pose, I don't want them just going on these statements that the other side, the state, got from these witnesses. And so I believe that under 2254B1B1, the process here fails, and so the determination of the ineffective assistance claim there was not a fair process, and so there's no procedural bar under that portion of the habeas statute. And Judge Panner looked at that. He acknowledged the lawyer did absolutely nothing. He said, unfortunately, Townsend binds me. He was viewing what we were saying as a complaint that ineffective assistance of counsel in post-conviction was the problem. But our complaint was what Mr. Smith directly appealed from that, with the trial courts not granting him a continuance to get the witnesses he needed, to get the evidence he needed, and not giving him a new lawyer. I would, unless you have more questions, I'd just conclude by saying, habeas is an equitable remedy. There is a palpable injustice in this case. The state's hands are not clean here. Not only did they conceal the polygraph results for 13 years, they then exacted Mr. Edmonds' silence by threatening him with the death penalty. And I've addressed the point. But his silence, of course, has nothing to do with whether he got a fair trial in the first instance, because his silence has only been exacted now in post-trial relief. Yes. Surely the state may let Mr. Edmonds know that if he recants his prior testimony, what the consequences to him are. What the state does is, I think, more pernicious than that. Certainly it may be appropriate for them to say the consequences if you breach the plea agreement. I call it pernicious in the first instance because the state has been complicitous for 15 years in him having gone into a plea agreement that was never the conditions precedent for which were not met. But then here they say, we'll give you immunity from prosecution for perjury for a false statement, meaning if you renounce your recantation. But if you testify you killed this person, as the state should be on notice and has been on notice and has been hiding for a long time, they say, you breached your plea agreement and we're going to take the death penalty from you, or we're going to try to. And I suggest to you that that certainly further evidence of their unclean hands. If I can go through. But all that goes to, what does that get you in this case? Let's assume we agree that it's not simply informing the defendant of his future, but that it's the state trying to get somebody not to tell the truth by threatening to execute him if he does. Let's assume that. What does that do except refute what the district court judge said, which was there's no point in the hearing because the witness isn't going to testify. Other than that, where does it get you with your basic claim? It doesn't directly impact on the ineffective assistance claim where I think it is. Important is both in weighing the Brady claim and in what can happen on remand in the district court. I think it is fair under these circumstances. And given the complicity of the state for so long in letting this breach of the agreement where this killer got out of jail in 34 months and committed some other horrible crimes, exists for so long, it would be absolutely appropriate as we saw it in the district court to compel them to immunize him so that the truth. So it only has to do with really is what type of proceedings would now occur in the district court, not with whether there's any invalidity in the conviction. It is not a separate constitutional grounds for invalid in conviction. I think it does point to what you say. I mean, you may argue it at some point in the district court. But the legal effect of it basically would be as to what type of proceeding would be held in the district court. You would ask the judge to do something about ensuring that he testifies and gets immunity. Yes. All right. Thank you. Let me if I can just read you a phrase from Judge Trott, which I think sums this up. And this is the writing for the circuit and money. So Brunel, he wrote, we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery. And he's talking about the treachery of informants and co-defendants and not disclosing what needs to be disclosed. And that's precisely what happened here because Mr. Smith's constitutional rights were violated. And because the default is excused as the ineffectiveness, the rich issue. Thank you for giving me so much time. Thank you. Please, the court. I'm Kathleen Segla appearing for George Baldwin, the respondent. The issue before the court is whether petitioners, federal claims, constitutional claims were procedurally defaulted and whether he has, in fact, established actual innocence or cause and prejudice or anything else to allow the federal court to review those claims on their merits. It's our position that all of those claims were procedurally defaulted that he attempted to raise in the federal habeas. Now, you're disagreeing with counsel with regard to the Brady violation. I'm including the Brady violation in this as well. Well, you think that the government or the state have raised the question of whether that's procedurally defaulted? Brady claim? I think the Brady claim was procedurally defaulted. The reply brief is probably right. I probably didn't address that directly in the red brief. But it's defaulted because petitioner, once he finally discovered or believed that the prosecutor had withheld the evidence of the polygraph results of the codefendant, he could have gone back to the state court and raised a successive petition alleging this and arguing that I could not have raised it previously because I only found out now that the prosecutor had engaged in this skullduggery and I could not reasonably have discovered it earlier. And he didn't take that step. So in that sense, it's procedurally defaulted because he's not in the state court. Well, I understand the argument now. Was that raised in the district court? That I don't remember, Your Honor. I did not have a chance to reread our filings in the district court. But it's pretty clear it wasn't raised in the red brief. That's probably true. Okay. So now you're making kind of an independent argument. Which may be procedurally defaulted since we care so much about procedural defaults. Well, I'm responding to the reply brief, which did point this out. There was an oversight on my part. I don't think anybody's been surprised by it. It's not a surprise. It's a question of whether it's procedurally defaulted. You know, since we're going to enforce the rules, we ought to enforce them both ways. Well, thank you, Your Honor. The main point on all of that, I guess, on the Brady claim, is, again, this is a – it has to be simply a gateway. Why? Well, let me back up here. Let me talk about the claims that we did argue were procedurally defaulted first to get myself back on track, if I may. Okay. All right. The claim that is procedurally defaulted is the ineffective assistance of counsel claim? Yes. There were a number of ineffective assistance. Okay. They're all within that general – that category of ineffective assistance. Right. Okay. And those are the ones that you say are procedurally defaulted. And their answer to that is actual innocence. Yes. Okay. And I think the – for all the reasons that the district court rejected that argument that are all laid out in Judge Panner's opinion at ER 907-910 in particular, where he reviews all of the information that Edmonds was saying, not just the recantations, the fact that they were in the house once, left the house, returned to the house to look for the wallet, that they both wore masks. Edmonds at some point – and I was looking for this just now and couldn't find it in his testimony or a police report somewhere – says both of the men handled the crowbar before they actually – the assault took place. What was – I missed that. You said what's the evidence that they both handled it? Edmonds either testified to that at the bail hearing or it's in a police report. I think he testified to it in the bail hearing, which I was just rereading this morning. Unfortunately, I didn't take down the page number. So – but there is evidence in addition to – I mean, Judge Panner went through all of the evidence. You don't – to decide actual innocence, you don't look only at the new piece of information. You look at all of the evidence, and his conclusion was that – Including the two recantations, right? Yes. Yes, but you don't look just at the recantations. But you look at everything that Edmonds said and the other evidence that was available. And I'll concede that the main evidence against Petitioner was Edmonds because they were the only two people in the room. Mrs. Conzelman saw some things that – But if he said that they both handled the crowbar, that was when he was telling a story that it was Smith who used the crowbar. So, I mean, I don't quite see how that really adds much to, you know, his statement that Smith was a murderer or that it's severable from it and an independent statement that's unrelated to it. I mean, if he recanted his story that Smith was the one who used the crowbar, you're saying that doesn't mean he recanted the story that Smith handled the crowbar. Right. I don't think his recantation – His recantation is not, I lied about everything. His recantation is Petitioner did not hit Mr. Conzelman with the crowbar. That's really the sum and substance of it. But the fact that if, in fact, both men had handled the crowbar beforehand, that goes to Judge Panner's analysis of the inability to prove the defense to felony murder. If he were able to testify, however, if he were able to testify – The Edmonds or Petitioner? Edmonds. Okay. Then that all might come out, wouldn't it? Whether he handled the crowbar, all those things, if the State had not threatened him so that he would not testify. Well, I guess I disagree with the idea that the State threatened him with anything. The Petitioner's reply brief points to the Assistant Attorney General's affidavit describing the offer, which was, we just wanted him to tell the truth so we could ask him about how these affidavits were prepared, and that things led from there. But it wasn't – and here's the problem, too. We don't have a record of the discussion. We just wanted him to tell the truth. But, by the way, if you testify, you're going to subject yourself to capital punishment, right? It's a risk that we believe, in order to be fair to Mr. Edmonds, that Mr. Edmonds needed to be aware of before he went around signing papers, affidavits, and contending for murder. The best way to get the truth. I'm sorry? If you wanted to get the truth, you might say to him, You know, we could subject you to capital punishment if you say this, but we really want the truth to come out, so we want you to know you don't have to worry about being executed if you say that. The problem is, as Judge Panner acknowledged and recognized, if you say that to Mr. Edmonds, then knowing that he can't be convicted for the murder, he can say anything, and it may or may not be the truth. It would distort the proceedings either way. And so now he can testify that Mr. Smith wasn't even there in the bedroom. You know, he can say all kinds of things if he gets total immunity for this event. I didn't say total immunity. I just said he wouldn't be executed. There is something short of execution in the way of punishment in this life. But the charge was aggravated murder, And what Mr. If we infer from Mr. Edmonds' recantation that he's the one who struck Mr. Kahnselman killing him during the commission of a felony, that would be a confession to aggravated murder. I understand that. But there's nothing that compels a prosecutor to seek the death penalty. It would be a decision that's made on a county-by-county basis. I don't know what the policy is in Linn County for pursuing those. Some counties say if it's an aggravated murder, we take it to the jury and the jury decides. And I don't know what the policy in Linn County is. Well, whatever it is, you would think that the person who is told that by the prosecutor, that if he says that he did it, that there's a good chance he can be executed, that that would not encourage him to say that if that happened to be the truth. I agree that that's true. So, you know, it may be a conundrum of sorts. It may be a problem. And it may be that you could view it as simply telling him the truth, that this is a possibility. Or you could look at it the other way, which is once you tell him that, there's no way he'll tell the truth if that is the truth, that there's no way he's going to say it. You've just succeeded, maybe unintentionally, in making the key testimony unavailable. It's a conundrum that doesn't really need to be dealt with in this case, though, because this case is somewhat different from the other actual innocent cases that are out there. In most of those cases, all the ones I looked at, you have a situation where the case actually went to a trial. What we have in this case is a plea of no contest. After the petitioner was advised by his attorneys that if he chose to go to trial, he ran a risk of being convicted of at least felony murder because they could not, they did not think that they could prove the affirmative defense. And that Edmonds had indicated in a polygraph that Smith was the actual murderer. Yes, and if we're going to talk about polygraphs, I think it's important to note the petitioner also took a polygraph. That's discussed at the sentencing hearing. Apparently the results are in the pre-sentence investigation report. At ER 575, petitioner's attorney was arguing to the court that it shouldn't consider the results of petitioner's polygraph. I think a fair inference from that argument is that petitioner did not pass the polygraph that was reported in the pre-sentence investigation report. But you don't have the results of that polygraph? No, and the pre-sentence investigation report I do not believe is in the record either. I went hunting for that to see what exactly did it say and was unable to find it. I want to go back to a question that I asked Mr. Hester. Is it usual for the polygraph administrator to comment on the evidence in the way that this one did? Well, I've only had one experience with a polygrapher. There isn't anything in the record to show what's normal and what's not normal. That is the fact. But in discussing polygraphs with one expert at one time, I was told that you always review the questions beforehand, which Mr. Hester thinks that's unusual with the subjects. I think it's probably, and I can't remember if I ever asked him about do you give your opinion, but the point is there is no evidence in the record to show that that would be unusual. Why didn't the state simply turn over the results of the polygraph? I don't know. If petitioner had raised this in any of his state court proceedings, we could have found out. But it was not. I don't know. All I know is the two letters that were in there. I wasn't the trial attorney, so Mr. Hester has the advantage over me in that regard. But I don't know whether or not. It might have had a bearing, wouldn't it, counsel, on the way that Mr. Smith approached this? If Mr. Smith had an idea that Edmund's testimony was inconclusive, might that have influenced his decision to plead no contest to felony murder? In other words, he might not have feared getting anything worse than felony murder, but he might have thought that the worst he could get was exactly what he was pleading to and therefore have been willing to take his chances that he might get something less. I don't think it could have made any difference at all because if, in fact, what does the inconclusive polygraph tell us? Let's assume even better that Mr. Edmunds totally flunked the polygraph. And so the polygraph says he's lying when he says he didn't hit them. That's something the petitioner had to know the day that he decided to plead no contest if, in fact, the petitioner did not hit the victim. So the polygraph results don't add anything to Mr. Smith's calculations about what he did, what he thinks can be proved. It certainly adds, if you've got an 18-year-old kid, that somebody at the prosecution is saying, look, Edmunds said you did and it's substantiated by a polygraph and you get the death penalty. It seemed to me that it would certainly scare him. If the prosecutor could somehow use the polygraph at trial, if Mr. Smith had chosen to go to trial, that might be true. But the polygraph is going nowhere. It might have influenced the way he was counseled, though. Even if it's not an ineffective assistance of counsel in any respect here, the counsel might have looked at those results and said, gee, well, maybe we got a little better shot than we thought we did. And the worst that could happen is you get convicted of a felony murder, which is what you're going to plead no contest to anyway, so we don't have anything to lose. That's a possibility, but I don't think it's the kind of possibility that really makes any difference in the issues that are before this court in this case today. I'll tell you something that probably has nothing to do with the issue before us in the court, but I just have a very uneasy feeling. There's no doubt that his sentence was resulted from the belief that he did it. And on the other hand, Edmonds got 43 months on the basis that he didn't do it, that Smith did it. In some way or other, this seems an awfully inequitable result. Well, first of all, this is a factual statement, an incorrect statement that keeps being made over and over again, that Edmonds got 43 months. He might have served 43 months of his 20-year sentence before he was paroled, but he was sentenced to 20 years in prison for robbery in the first degree, which is the top of the range for a robbed woman. But he's on the hook for 20 years, even if he goes out and commits more crimes and comes back in. So he didn't get 43 months. And I lost track of the first part of this. The sentence that was imposed was also imposed because Petitioner is the person between Petitioner and Edmonds. He's the one who actually had a prior history of violent behavior against other people, physically attacked a young kid who testified at the sentencing hearing, shot at people in a road rage incident, even while he was in jail, just came up unprovoked and whacked some other inmate in the head. Whereas Edmonds, and again, it would be helpful if we had, if we're going to talk about why the sentence was imposed the way it was, if we had the pre-sentence investigation report in addition. Because I don't know what Edmonds' prior criminal history was. He may not have had any, because we don't have. He certainly had a bad subsequent. I'm sorry, well, that's true. But it's irrelevant. I mean, what happened afterwards can't shed any light on why either one of them got the sentence that they did before. I'm way over my time. That's all right. We have a free morning. I think I may have covered everything that I needed to cover. Just in summary, I think the district court got it right when it said that the evidence is not sufficient to show actual innocence at the level that has to be established. And that is because we're focusing on what the affirmative defense is? That's the easiest way to get there. I'm real unhappy with my red brief. I'd read it from the back to the front, I guess, if I were doing it again, that what he pleaded no contest to and was convicted of was felony murder, and that he couldn't show that he was actually innocent of that because he couldn't prove the affirmative defense. And then as a backup, I think the magistrate judge also had it right in his analysis that if you look at all of the evidence that could have come in, including the recantation and the accusations, that it just doesn't rise to that level where no reasonable juror, it's not likely that no reasonable juror would not convict him. What about the final point, Counsel, that it's not procedurally defaulted because he didn't get a fair post-conviction proceedings in the state court? Well, I was the trial attorney at that one. I think the record belies Judge Panner's impatient saying that the attorney didn't do anything and the judge just shouldn't have denied his motion for continuance. If you read the transcript of the post-conviction hearing, it actually goes on for pages and pages where the judge is trying to find out from Mr. Smith, well, what exactly did you want your lawyer to do? What has he not done that you want him to do? Are there more claims that you want to have raised here? And the thing that comes up at that hearing when it's actually being discussed is, I wanted my lawyer to take these depositions. And the lawyer says, I don't think they would have helped. And I can tell you from personal experience on that that that's true. I would have been delighted to go and have these people have their depositions taken because if they're preparing an affidavit, when I send them the petition and say, here are these claims, and they send me back a letter that says, that's not true, that's not true, that's not true, which is what happened here, I just can't imagine that a deposition is going to make the case any better for the petitioner. And Judge Miller, the post-conviction judge, also knows that. And then the Court of Appeals affirmed. And the Supreme Court denied review. So I don't think he was prevented from pursuing his case. Thank you, counsel. Thank you. I was pleased that you referred to the magistrate judge. You might bring that to the state's office. The entire brief in the Lee case, the attorney there referred only to the magistrate throughout the whole thing. And I think that was improper. So you might bring that back to the office. Thank you. I think I actually went and asked around, is it magistrate or magistrate judge? You did? I think I did. Why would you do that? It's pretty clear, isn't it? Well, I don't do a lot of work in the federal courts, Your Honor. There was a change a number of years ago when the magistrates, as they used to be called, succeeded in persuading Congress that we were required to call them magistrate judges. I guess the news hasn't gotten to the states. Okay. I may respond on four points. The first regarding the post-conviction trial, the initial post-conviction trial, because there were two attempts at that. Had the state been desirous of deposing those witnesses, they could have called them as witnesses. Judge Panner's findings are manifestly correct that the lawyer, and when you go through that record, did absolutely nothing. He hadn't met with his client. He hadn't gotten the transcripts of the sentencing. He filed nothing, no trial memo, no pretrial things. He called no witnesses. And when the judge asked, well, we're calling these witnesses help, he said no. But Judge Panner's finding on that is absolutely correct. At what stage now should he have done all this? He had pled guilty, well, with no contest. Now what I'm speaking of is the post-conviction trial, because that's where the putative default of the ineffective assistance claims occurs. And the lawyer who was appointed to represent Mr. Smith, who Mr. Smith asked the court to replace or give him a continuance so he could do what the lawyer wasn't, did nothing. Now, he wasn't actually even entitled to counsel at that stage. He was not. And that's why Judge Panner, correctly as to the effectiveness of that lawyer, focused on Coleman. But the issue, which I raised at 15 to 17 in the reply brief, of the effectiveness of the state process is not based on counsel's performance there, but rather on the judges denying Mr. Smith, in the face of counsel's non-performance, a fair opportunity to develop the facts that supported the ineffective assistance claim. I'll rely on my brief at 15 to 17 on that in the reply brief. With regard to the kind of Westerdahl stuff, just note in Judge Panner's opinion at 904, he specifically found the Linn County Prosecutor's Office then warned Edmonds' counsel that the district attorney would seek the death penalty if Edmonds testified that he, and not Smith, actually killed Emmett Coleman. And with regard to the issue of procedural default as to the Brady claim, that was simply never raised by the state previously. And the final point, just with regard to the sentence that Edmonds got, if you look at Edmonds' plea agreement on page 187 of the exit of record, you can see that the prosecutor has written that the state will only mention the 43-month sentence and no more, and seek concurrent sentences. So while technically this may have been an indeterminate sentence under the old parole system, that was the result. And you also find that either Judge Panner – Wait a minute. You lost me on that. Well, the state has suggested that the 43-month number may be what he actually served, but it wasn't the real sentence he got. That was the sentence that was anticipated, and it's memorialized by the prosecutor on the plea agreement, which is at page 187 of the record. That's what he would get, is that right? That is what – it didn't bind the court. It wasn't a contract plea in that sense, but that that was all that the state would mention, and it was what they would seek. It's also the case that either Judge Panner or the magistrate judge in their finding in this case found that the agreement for his sentence was 43 months. Thank you very much. Thank you, counsel. Thank you both very much. The case just argued will be submitted. The court will adjourn for the day.
judges: Hug, Reinhardt, Bybee